IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **24-11349-J**

United States of America,

Appellant,

- versus -

Abel Rizo,

Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

# BRIEF FOR THE UNITED STATES IN SUPPORT OF GOVERNMENT APPEAL

Markenzy Lapointe
United States Attorney
Attorney for Appellant
99 N.E. 4th Street
Miami, Florida 33132-2111
(305) 961-9277

Daniel Matzkin
Chief, Appellate Division

Yeney Hernandez
Assistant United States Attorney

Of Counsel

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons**

In compliance with Fed. R. App. P. 26.1 and 11th Circuit Rules 26.1 and 28-1, the undersigned certifies that the list set forth below is a complete list of the persons and entities who have an interest in the outcome of this case.

Abrams, Stewart Glenn

Acosta, R. Alexander

Acosta, Luis

Adelstein, Stuart

Aldazabal, Mauricio Lopez

Almon, Jr., Thomas F.

Alujas, Rafael Denis

Alvarez, Jacinto

Anderson, Rhonda Anne

Armstrong, Lance

Baer, Leonard F.

Bandstra, Hon. Ted E.

Batista, Jose Rafael Esteban

Bencomo, Abraham

Bierman, Donald I.

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons (Continued)**

Brown., Hon. Stephen T.

Carlson, Patricia Jean

Cheron, Francesse Lucius

Clark, Nathan Dorlon

Codias, Julio Cesar

Coffey, Kendall

Cohn, Hon. James

Comolli, Alexandra

Crespo, Jerry Dean

Cruz, Jaime

Cuellar, Leonardo

D'Angelo, Ellen

Davis, Hon. Edward B.

De la Tejas, Carlos Gustavo

Diamond, Nathan P.

Diaz, Juan Guillermo

Diaz, Richard John

Dominguez, Humberto Rolando

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons (Continued)**

Dube, Hon. Robert L.

Encinosa, Israel Jose

Entin, Alvin Ernest

Fajardo Orshan, Ariana

Farias, Barbara

Fels, Adam Seth

Ferrer, Wifredo A.

Gainor, Ronald

Gallego, Felix

Gallego, Jr., Lazaro

Galvez, Rogelio

Garber, Hon. Barry L.

Golder, Randee J.

Golembe, Stephen J.

Gonzalez, Gabriela Teresa

Gonzalez, Jorge A.

Gonzalez, Juan Antonio

Gonzalez, Juan De Jesus

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons (Continued)**

Gonzalez, Luis E.

Goodman, Hon. Jonathan

Graham, Hon. Donald L.

Greenberg, Benjamin G.

Grey, Jason P.

Hernandez, Ariel

Hernandez, Yeney

Hernandez, Santiago

Hersch, Richard

Highsmith, Hon. Shelby

Huck, Hon. Paul C.

Isern, Juan Lorenzo

Jimenez, Marcos Daniel

Johnson, Hon. Linnea R.

Juenger, Jon Milton

Kaplan, Joel

Keefer, William A.

Killinger, Russell R.

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons (Continued)**

Kyle, Patricia Jean

Korchin, Paul Maury

Lapointe, Markenzy

Lazarus, Paul David

Leiva, Sr., Rafael

Levine, Jay L.

Lewis, Guy A.

Lewis, Neal Randolph

Lichter, Irwin G.

Lopez, Julio

Lopez, Lorenzo

Lowenthal, Sheryl Joyce

Marin, Antonio E.

Marrero, Ceasar

Mastos, Theodore

Matzkin, Daniel

McCabe, Hon. Ryon M.

McDonald, Ian

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons (Continued)**

Moore, Hon. K. Michael

Moore, Robert F.

O'Donnell, Edward

Oliva, Ruben

Oliveros, Jr., Armando

Ontivero, Jose Alberto

Palermo, Hon. Peter R.

Palma, Diego

Paulson, Sterling

Pelegrino, Juan Carlos

Pena, Alexander

Pena, Guillermo Enrique

Perez, Emmanuel

Perez, Osiel

Prebish, Gregory Alan

Raben, David

Rabin, Jr., Samuel J.

Rizo, Abel

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons (Continued)**

Rizo, Jr., Evelio

Rizo, Sr, Evelio

Rizo, Marta

Rodriguez, Jorge

Rosenbaum, Hon. Robin S.

Roth, John

Saldana, Alfonso M.

Schwartz, Fred Arthur

Scott, Thomas E.

Seitz, Hon. Patricia A.

Seltzer, Hon. Barry S.

Smith, Michael G.

Snow, Hon. Lurana S.

Sobol, Thomas M.

Sohn, Howard Allan

Sperber, Harris

Steckel, Simon Toby

Tarkoff, Michael

**United States v. Abel Rizo, Case No. 24-11349-J**

**Certificate of Interested Persons (Continued)**

Tamen, Frank

Turnoff, Hon. William C.

Urbano, Dennis Nicholas

Vento, Carlos

Venta, Gustavo

Weiner, Jeffrey Stuart

s/ *Yeney Hernandez*
Yeney Hernandez
Assistant United States Attorney

## Statement Regarding Oral Argument

Because this appeal presents an issue of first impression concerning the interpretation of 18 U.S.C. § 3582(c)(1)(A), one that affects multiple appeals and pending sentence-reduction motions, the United States of America respectfully requests oral argument.

## Table of Contents

**Page:**

Certificate of Interested Persons ....................c-1

Statement Regarding Oral Argument ....................i

Table of Contents .................... ii

Table of Citations ....................iv

Statement of Jurisdiction ....................xi

Introduction ....................iv

Statement of the Issue ....................1

Statement of the Case:

1. Legal Background ....................2

 A. The Sentencing Reform Act of 1984 ....................2

 B. The First Step Act Of 2018 ....................5

 C. The Sentencing Commission's 2023 Amendments To Sentencing Guidelines § 1B1.13 ....................7

2. Course of Proceedings and Disposition in the Court Below ....................10

3. Statement of the Facts ....................13

 A. The Lozano Home-Invasion Robbery ....................14

 B. Puerto Rican Cocaine Theft ....................15

 C. Kidnapping and Marijuana Theft of "Ricardo" ....................16

 D. Kidnapping and Attempted Robbery of Edison Cano ....................16

 E. Robbery of Mercy De La Torre ....................18

**Table of Contents**

**(Continued)**

**Page:**

F. Robbery of Milton's Cousin ....................................................19

4. Standard of Review ....................................................................19

Summary of the Argument ...............................................................19

Argument:

I. The Sentencing Commission Exceeded Its Congressionally Delegated Authority In Promulgating Sentencing Guidelines § 1B1.13(b)(6) .............21

a. As a textual matter, an intervening change in the law is neither "extraordinary" nor "compelling." ..................................................23

b. Statutory context confirms that "extraordinary and compelling" cannot include intervening changes in law ..................................................29

c. Permitting consideration of changes in law undermines the Sentencing Reform Act's primary purpose.........................................................34

II. Other Circuits Have Concluded That "Extraordinary and Compelling" Does Not Encompass Nonretroactive Changes in the Law .................................42

Conclusion .........................................................................................47

Certificate of Compliance ....................................................................48

Certificate of Service ...........................................................................49

**Table of Citations**

**Cases:** **Page:**

*Banister v. Davis*,
590 U.S. 504 (2020) ............................................................................40

*Batterton v. Francis*,
432 U.S. 416 (1977) ............................................................................20

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) ............................................................................20

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016) ............................................................................20

*Dillon v. United States*,
560 U.S. 817 (2010) ............................................................................2, 19

*Dorsey v. United States*,
567 U.S. 260 (2012) ............................................................ xii, 23, 25, 39

*Jones v. Hendrix*,
599 U.S. 465 (2023) ............................................................................30

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ............................................................................25

*Mayo Found. for Med. Educ. & Research v. United States*,
562 U.S. 44 (2011) ..............................................................................20

## Table of Citations

## (Continued)

**<u>Cases</u>:** **<u>Page</u>:**

*Mistretta v. United States*,

488 U.S. 361 (1989) .......... 20

*Neal v. United States*,

516 U.S. 284 (1996) .......... 2, 31

*Preiser v. Rodriguez*,

411 U.S. 475 (1973) .......... 30

*Rizo v. United States*,

446 F. App'x 264 (11th Cir. 2011) .......... 9

*Rizo v. United States*,

662 F. App'x 901 (11th Cir. 2016) .......... 9

*Tapia v. United States*,

564 U.S. 319 (2011) .......... 2, 32

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,

484 U.S. 365 (1988) .......... 29

*United States v. Adley*,

No. 03-cr-20678, 2024 WL 1961484 (S.D. Fla. May 3, 2024) .......... 34

**Table of Citations**

**(Continued)**


**Cases:** **Page:**

*United States v. Andrews*,

12 F.4th 255 (3d Cir. 2021)................................................................ 5, 25, 38, 41

*United States v. Bryant*,

996 F.3d 1243 (11th Cir. 2021)................................................................ 5, 37, 40

*United States v. Capps*,

No. 11-cr-108, 2024 WL 880554 (E.D. Mo. Jan. 31, 2024)................................33

*United States v. Chen*,

48 F.4th 1092 (9th Cir. 2022) ..........................................................................6, 38

*United States v. Crandall*,

25 F.4th 582 (8th Cir. 2022) ............................................................................5, 38

*United States v. Crandall*,

No. 89-cr-21, 2024 WL 945328 (N.D. Iowa Mar. 5, 2024) ................................32

*United States v. Douglas*,

No. 11-cr-324, 2024 WL 2513646 (D. Minn. May 24, 2024)....................... 33, 34

*United States v. Gallego*,

247 F.3d 1191 (11th Cir. 2001)..........................................................................9, 11

**Table of Citations**

**(Continued)**

**Cases**: **Page**:

*United States v. Hill*,

No. 11-cr-536, 2024 WL 2089011 (N.D. Ohio May 9, 2024)..............................34

*United States v. Howard*,

No. 13-cr-629, 2024 WL 112010 (D. Md. Jan. 10, 2024)...................................33

*United States v. Jenkins*,

50 F.4th 1185 (D.C. Cir. 2022)............................................. 5, 25, 25, 34, 37, 38

*United States v. Jones*,

980 F.3d 1098 (6th Cir. 2020)..........................................................................5

*United States v. LaBonte*,

520 U.S. 751 (1997)........................................................................................20

*United States v. Maumau*,

993 F.3d 821 (10th Cir. 2021)........................................................................23

*United States v. McCall*,

56 F.4th 1048 (6th Cir. 2022) ................. 5, 6, 18, 22, 24, 27, 30, 31,36, 38, 39, 40

*United States v. McCoy*,

981 F.3d 271 (4th Cir. 2020)........................................................................6, 38

## Table of Citations

## (Continued)

**Cases**: **Page**:

*United States v. McGee*,

992 F.3d 1035 (10th Cir. 2021)....................6, 38

*United States v. McMaryion*,

No. 21-50450, 2023 WL 4118015 (5th Cir. June 22, 2023)....................5, 38

*United States v. Mead Corp.*,

533 U.S. 218 (2001)....................20

*United States v. Miller*,

No. 09-cr-1, 2024 WL 476879 (E.D.N.C. Feb. 7, 2024)....................33

*United States v. Ruvalcaba*,

26 F.4th 14 (1st Cir. 2022).................... 6, 37, 38

*United States v. Thacker*,

4 F.4th 569 (7th Cir. 2021) .................... 5, 23, 30 , 38

*United States v. Ware*

2024 WL 1007427 (N.D. Ga. Mar. 6, 2024)....................10

*United States v. Williams*,

790 F.3d 1240 (11th Cir. 2015)....................18

**Table of Citations**

**(Continued)**


**Cases:** **Page:**

*United States v. Wilson*,

No. 13-cr-20369, 2024 WL 1342618 (E.D. Mich. Mar. 29, 2024) ......................33

*Whitman v. Am. Trucking Ass'ns*,

531 U.S. 457 (2001) ..........................................................................................37

*Wisconsin Cent. Ltd. v. United States*,

585 U.S. 274 (2018) ..........................................................................................22

**Statutes & Other Authorities:**

1 U.S.C. § 109 ......................................................................................... 23, 24

18 U.S.C. § 924 ...........................................................................................1, 33

18 U.S.C. § 1951 ...............................................................................................1

18 U.S.C. § 3231 ............................................................................................ xi

18 U.S.C. § 3551 ...............................................................................................2

18 U.S.C. § 3582 .......................................xi, xii, 2, 4, 26, 29, 36, 39, 41

18 U.S.C. § 3742 ............................................................................................ xi

18 U.S.C. § 4205 ...............................................................................................3

18 U.S.C. § 3553 .................................................................................. 2, 4, 11

**Table of Citations**

**(Continued)**


**<u>Statutes & Other Authorities</u>:** **<u>Page</u>:**

21 U.S.C. § 841 ....................1

21 U.S.C. § 846 ....................1

28 U.S.C. §§ 991 ....................2

28 U.S.C. § 994 .................... 3, 8, 20, 21, 26, 28, 29

28 U.S.C. § 1291 .................... xi

28 U.S.C. § 2255 ....................30

Fed. R. App. P. 4 .................... xi

Fed. R. App. P. 26.1 .................... c-1

Fed. R. App. P. 32 ....................43

**<u>Other Authorities</u>:**

The Sentencing Reform Act of 1984, Pub. L. No. 98-473, ....................2

Fair Sentencing Act of 2010, Pub. L. No. 111-220 ....................23

First Step Act of 2018, Pub. L. No. 115-391 .................... 4, 28, 37, 40

**<u>United States Sentencing Guidelines</u>:**

U.S.S.G. § 1B1.13 ....................7, 32, 41

## Statement of Jurisdiction

This is an appeal from a final order of the United States District Court for the Southern District of Florida granting Rizo's motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i) (DE1748). The district court had jurisdiction to enter the order pursuant to 18 U.S.C. § 3231. The United States filed a timely notice of appeal on April 29, 2024 (DE1750); *see* Fed. R. App. P. 4(b). Pursuant to 18 U.S.C. § 3742(b), the Solicitor General of the United States of America authorized this appeal prior to the filing of the Government's initial brief. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b).

## Introduction

In 18 U.S.C. § 3582(c)(1)(A)(i), Congress enacted a narrow exception to the general rule that a federal court "may not modify a term of imprisonment once it has been imposed," permitting a court to reduce a term of imprisonment where it finds that "extraordinary and compelling reasons" warrant a reduction. Congress directed the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons." 28 U.S.C. § 994(t). This was not, however, a license to upend sentencing repose. And yet the Commission did just that when it transformed routine nonretroactive changes in the law into "extraordinary and compelling" reasons for relief. But as the Supreme Court has explained, "in federal sentencing the ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey v. United States*, 567 U.S. 260, 280 (2012).

In Sentencing Guidelines § 1B1.13(b)(6), the Sentencing Commission authorized district courts to find "extraordinary and compelling" reasons for a sentence reduction when certain defendants are serving "an unusually long sentence" because "a change in the law" has "produce[d] a gross disparity between the sentence being served and the sentence likely to be imposed" today. The Commission's determination rests on a sweeping and unsupported view of its authority to describe what qualifies as an "extraordinary and compelling reason" for a sentence reduction, under which even commonplace events like nonretroactive changes in law can qualify. In promulgating subsection (b)(6), the Commission has dramatically

transformed Section 3582(c)(1)(A)(i) into a form of pseudo-parole that empowers judges to override applicable retroactivity principles and even Congress's judgments on mandatory sentencing based on judges' individual assessments—often years after the fact—of whether a defendant's sentence is "unusually long" or produces a "gross disparity."

The district court granted Defendant-Appellee Abel Rizo a sentence reduction after finding subsection (b)(6) valid and applying that provision. But while Congress delegated broad authority to the Sentencing Commission, that delegation was not unbounded. The governing statute unambiguously prohibits the Commission from deeming nonretroactive changes in law "extraordinary and compelling." This Court should reverse the district court's order.

## Statement of the Issue

Did the Sentencing Commission exceed its congressionally delegated authority in defining "extraordinary and compelling" circumstances to include a nonretroactive change in the law under Sentencing Guideline § 1B1.13(b)(6)?

## Statement of the Case

Following a five-week trial in the United States District Court for the Southern District of Florida, Rizo was convicted of: conspiring to distribute cocaine, in violation of 21 U.S.C. § 846; possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); two counts of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); using and carrying a firearm in relation to a Hobbs Act robbery and a drug-trafficking crime, in violation of 18 U.S.C. § 924(c); and using and carrying a firearm in relation to an attempted Hobbs Act robbery and a drug-trafficking crime, in violation of 18 U.S.C. § 924(c) (DE663). The district court sentenced Rizo to 468 months, to be followed by five years' supervised release (*id.*).

In November 2023, Rizo filed the instant motion for a sentence reduction under Section 3582(c)(1)(A) (DE1718), which the district court denied because he failed to exhaust his administrative remedies (DE1724). He refiled after unsuccessfully petitioning the warden, and the district court granted the reduction motion (DE1739).

## 1. <u>Legal Background</u>

### A. The Sentencing Reform Act of 1984

The Sentencing Reform Act of 1984, Pub. L. No. 98-473, Tit. II, Ch. II, 98 Stat. 1837, 1987 (18 U.S.C. § 3551 *et seq.*), "overhaul[ed] federal sentencing practices." *Tapia v. United States*, 564 U.S. 319, 325 (2011). To make prison terms more determinate, Congress established the Sentencing Commission as an independent agency in the Judicial Branch and "authorized it to promulgate Sentencing Guidelines and to issue policy statements." *Dillon v. United States*, 560 U.S. 817, 820 (2010); *see* 28 U.S.C. §§ 991, 994(a). "The Commission was born of congressional disenchantment with the vagaries of federal sentencing and of the parole system," and Congress directed the Commission to "eliminate unwarranted disparities in punishment of similar defendants who commit similar crimes." *Neal v. United States*, 516 U.S. 284, 290-91 (1996).

Congress also abolished the practice of federal parole, specifying that a "court may not modify a term of imprisonment once it has been imposed" except in certain enumerated circumstances. 18 U.S.C. § 3582(c); *see Tapia*, 564 U.S. at 325. One of those circumstances, set forth in 18 U.S.C. § 3582(c)(1)(A)(i) (and commonly referred to as "compassionate release"), authorizes a court to "reduce [a] term of imprisonment . . . , after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds," as relevant here, that "extraordinary

and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." As originally enacted, Section 3582(c)(1)(A) authorized such reductions only "upon motion of the Director of the Bureau of Prisons" (BOP).[1] Sentencing Reform Act § 212(a)(2), 98 Stat. 1998.

Congress directed the Sentencing Commission to promulgate "general policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in [Section] 3582(c)." 28 U.S.C. § 994(a)(2)(C). Congress instructed the Commission, in promulgating policy statements regarding Section 3582(c)(1)(A), to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Congress specified that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

---

[1] Under the system of federal parole, the Bureau of Prisons had authority to move "[a]t any time" for the sentencing court to "reduce any minimum term [of imprisonment] to the time the defendant has served." 18 U.S.C. § 4205(g) (repealed). BOP regulations explained that the Bureau generally used that authority "only in particularly meritorious or unusual circumstances which could not reasonably have been foreseen by the court at the time of sentencing," including where "there is an extraordinary change in an inmate's personal or family situation or if an inmate becomes severely ill." 45 Fed. Reg. 23,364, 23,366 (Apr. 4, 1980). As the Senate Report accompanying the Sentencing Reform Act explains, Section 3582(c)(1)(A) was intended to be "similar to the authority" afforded to the BOP under 18 U.S.C. § 4205(g). S. Rep. No. 98-225, at 121 n.298 (1983).

In 2006, the Commission promulgated Sentencing Guidelines § 1B1.13, p.s. As amended in 2016, the policy statement described four categories of reasons that should be considered extraordinary and compelling: "Medical Condition of the Defendant;" "Age of the Defendant;" "Family Circumstances;" and "Other Reasons" "determined by the Director of the Bureau of Prisons" to be "extraordinary and compelling" "other than, or in combination with," the reasons described in the other three categories. Sentencing Guidelines App. C Supp., Amend. 799 (Nov. 1, 2016).

**B. The First Step Act Of 2018**

In the First Step Act of 2018, Congress amended Section 3582(c)(1)(A) to allow defendants, as well as the BOP itself, to file motions for a sentence reduction. *See* Pub. L. No. 115-391, Tit. VI, § 603(b), 132 Stat. 5194, 5239. As modified, Section 3582(c)(1)(A) now states:

> the court, upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*, may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

Shortly after the First Step Act's enactment, the Sentencing Commission lost a quorum of voting members, and remained without a quorum for more than three years. *See* 88 Fed. Reg. 28,254, 28,256 (May 3, 2023). The Commission thus did not immediately amend the applicable policy statement to account for the First Step Act's procedural change. In the intervening years, this Court held that the 2016-era policy statement applied to all compassionate release motions, whether filed by the defendant or by the BOP. *See United States v. Bryant*, 996 F.3d 1243 (11th Cir. 2021). In contrast, nearly every other circuit held that the existing policy statement's description of what should be considered "extraordinary and compelling" reasons for a sentence reduction was not applicable to defendant-filed motions. *See, e.g.*, *United States v. Jones*, 980 F.3d 1098, 1101 (6th Cir. 2020). As a result, and in the absence of a binding policy statement, the courts of appeals were obligated to construe the plain meaning of the phrase "extraordinary and compelling reasons" as used in Section 3582(c)(1)(A)(i). Most circuits to consider the question determined that a change in the law, whether considered alone or in combination with other factors, cannot constitute an "extraordinary and compelling" reason for a sentence reduction.[2] As one court explained, "the plain text of the

---

[2] *See United States v. McCall*, 56 F.4th 1048, 1050 (6th Cir. 2022) (en banc); *United States v. Andrews*, 12 F.4th 255, 261 (3d Cir. 2021); *United States v. Thacker*, 4 F.4th 569, 571 (7th Cir. 2021); *United States v. Crandall*, 25 F.4th 582, 585-86 (8th Cir. 2022); *United States v. Jenkins*, 50 F.4th 1185, 1198-1200 (D.C. Cir. 2022); *United States v. McMaryion*, No. 21-50450, 2023 WL 4118015, at *2 (5th Cir. June

compassionate-release statute" compelled the conclusion that "[n]onretroactive legal developments do not factor into the extraordinary and compelling analysis. Full stop." *McCall*, 56 F.4th at 1065-66.

### C. The Sentencing Commission's 2023 Amendments To Sentencing Guidelines § 1B1.13

In 2022, the Sentencing Commission regained a quorum, and after public notice and comment voted on April 5, 2023 to promulgate amendments to the Guidelines Manual, including to Section 1B1.13's policy statement. 88 Fed. Reg. at 28,254-28,281; *see also* Sentencing Commission Public Meeting Tr. 27-82 (Apr. 5, 2023) ("4/5/23 Tr.").[3] The amendments to Section 1B1.13 render the policy statement applicable to defendant-filed motions. As relevant here, the amendments also allow, with certain limitations, consideration of changes in law—including ones Congress has chosen not to make retroactive—when determining whether a defendant has presented an extraordinary and compelling reason for a sentence

22, 2023) (per curiam) (unpublished). Four circuits, in contrast, took the view that a change in the law can form part of an individualized assessment of whether to grant a sentence reduction, but only in combination with other case-specific factors. *United States v. Ruvalcaba*, 26 F.4th 14, 28 (1st Cir. 2022); *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020); *United States v. Chen*, 48 F.4th 1092, 1097-98 (9th Cir. 2022); *United States v. McGee*, 992 F.3d 1035, 1047-48 (10th Cir. 2021).

[3] https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20230405/20230405_transcript.pdf.

reduction. That change is reflected in new subsections (b)(6) and (c), which provide:

> (6) UNUSUALLY LONG SENTENCE.—If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

> (c) LIMITATION ON CHANGES IN LAW.—Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

88 Fed. Reg. at 28,255; *see* U.S.S.G. § 1B1.13(b)(6), (c).

The Commission divided 4-3 on whether to promulgate the amendments to Section 1B1.13. *See* 4/5/23 Tr. 81-82. The dissenting Commissioners explained that, in their view, the policy statement "goes further than the Commission's legal authority extends," and that the Commission had made "a seismic structural change to our criminal justice system without congressional authorization or directive." *Id.* at 60 (Commissioner Wong, delivering joint statement). In particular, the

Commission's decision to allow nonretroactive changes in law to establish a basis for a sentence reduction "supplants Congress's legislative role" and would authorize courts "to revisit duly imposed criminal sentences at the ten-year mark based on intervening legal developments that Congress did not wish to make retroactive." *Id.* at 60-61. "The separation of powers problem" arising from that result, the dissenting Commissioners explained, "should be apparent," as "[i]t is not the Commission's role to countermand Congress's legislative judgments." *Id.* at 61.

The Commission submitted its proposed Guidelines amendments to Congress on April 27, 2023. 88 Fed. Reg. at 28,254. Because Congress did not act to modify or disapprove of the amendments, they became effective on November 1, 2023. *See* Sentencing Guidelines App. C Supp., Amend. 814 (Nov. 1, 2023); *see also* 28 U.S.C. § 994(p).

**2. <u>Course of Proceedings and Disposition in the Court Below</u>**

In the 1990s, Rizo was part of a crew specializing in violent armed robberies of suspected drug traffickers. Rizo and his co-conspirators impersonated law enforcement to carry out their crimes. After a five-week trial, Rizo was convicted of drug trafficking, Hobbs Act robbery, and two Section 924(c) counts (DE509). The district court sentenced him to 168 months on the drug-trafficking and robbery counts, to be served concurrently; 60 months on the first Section 924(c) count; and 240 months on the second Section 924(c) count (DE663).

Rizo appealed, and this Court affirmed his conviction and sentence. *United States v. Gallego*, 247 F.3d 1191 (11th Cir. 2001). He filed a Section 2255 motion to vacate his sentence on ineffective-assistance grounds, which the district court denied (DE1331 & 1343). This Court vacated the order and remanded with instructions to hold an evidentiary hearing on Rizo's ineffectiveness claim. *Rizo v. United States*, 446 F. App'x 264, 266 (11th Cir. 2011). After an evidentiary hearing, the district court denied Rizo's Section 2255 motion (DE1558), and this Court affirmed that decision, *Rizo v. United States*, 662 F. App'x 901 (11th Cir. 2016).

In November 2023, Rizo moved for a Section 3582(c)(1)(A) sentence reduction (DE1718), which the district court denied for failing to exhaust available administrative remedies (DE1724). After exhausting his administrative remedies, Rizo renewed his motion (DE1730), citing the First Step Act's amendments to Section 924(c) as an extraordinary and compelling reason for a sentencing reduction. He argued that if he had been sentenced today, he would have received a mandatory consecutive sentence of 60 months on each Section 924(c) count, resulting in 10 years of imprisonment, rather than 25 (*id.* at 1730). The government opposed Rizo's motion, reasoning that the Sentencing Commission's policy statement conflicted with the text, context, and purpose of Section 3582(c)(1)(A) (DE1732).

In April 2024, the district court granted Rizo's motion and reduced his sentence on his second 924(c) conviction to a consecutive mandatory term of five years' imprisonment (DE1739:7). The court concluded that Rizo had established an extraordinary and compelling reason for a sentencing reduction under Sentencing Guidelines § 1B1.13(b)(6). Specifically, the court cited the First Step Act's change to the Section 924(c) sentencing scheme, which specified that the twenty-five-year enhanced penalty for a second Section 924(c) conviction only applied after a final conviction on the first offense (DE1739:2-3). Though acknowledging that the First Step Act's changes were not retroactive, the court nevertheless found that Rizo received an "unusually long sentence compared to what he would likely receive today" (*id*. at 2-3 (internal quotation marks omitted)).

The district court rejected the government's argument that the Sentencing Commission overstepped its authority by including nonretroactive changes in sentencing law within its definition of "extraordinary and compelling reasons" (DE1739:3). Recognizing the absence of Circuit precedent on the subject, the district court relied on *United States v. Ware*, Case No. 1:97-CR-00009-SJ, 2024 WL 1007427 (N.D. Ga. Mar. 6, 2024). In *Ware*, a Northern District of Georgia court held that the terms "extraordinary" and "compelling" were ambiguous and that the Sentencing Commission had "reasonably interpreted these terms to include

unusually long sentences which can be assessed in the light of nonretroactive changes in law." *Id*. at *7.

The district court next considered whether Rizo met the other requirements outlined in the policy statement, noting that he had served more than ten years of his sentence, and that his "individualized circumstances" established extraordinary and compelling reasons for relief (DE1739:5). Addressing the Section 3553(a) factors, the court noted that Rizo's "young age" (twenties) at the time of the crimes, his good conduct while imprisoned, and his lack of criminal history prior to the instant convictions warranted a reduction (*id*. at 6).

The court stayed its release order for sixty days to allow the government to appeal the decision (DE1748).

**3. <u>Statement of the Facts</u>**

In the 1990s, Rizo was part of a group of more than 15 individuals who often posed as police officers to steal drugs, money, and other valuables from persons believed to be drug traffickers. *Gallego*, 247 F.3d at 1194. Such robberies are generally known as "rip-offs," and, in this case, followed a consistent *modus operandi*. *Id.* at 1195. A member of the group, called a "santo," would obtain information about other drug dealers. *Id.* After relaying this information to the ringleaders—Rizo's father (Evelio Senior) and brother (Evelio Junior)—the santo would make a few controlled drug purchases from the targeted victim while other

members followed the victim to the drug storehouse (also known as a "stash house"). *Id.* Once the stash house was identified, members executed the rip-off by posing as police officers, forcibly subduing the victims, often at gunpoint, and raiding the stash-house. *Id.* Drug proceeds were then taken to the Rizo house in Hialeah, Florida, where Rizo's father and brother would distribute the ill-gotten gains to group members. *Id.*

Rizo was personally involved in planning and executing several violent robberies and kidnappings in furtherance of the group's activities.

**A. The Lozano Home-Invasion Robbery**

The Rizo crew learned that a unit at Pepper Cove Apartments in Miami contained between two and 50 kilograms of cocaine (DE904:564-65). Shortly thereafter, the crew gathered to plan the drug-rip (*id*. at 565). Rizo drove a white Nissan Pathfinder to that initial meeting and later to a nearby bowling alley for a second meeting (*id*. at 568). At the bowling alley, the inside man, known as "Danny," drew a diagram of the apartment and marked where the drugs would likely be stored (*id.* at 569).

The group, including Rizo, initially drove by the apartment but did not enter (DE904:570). Instead, they circled back and returned to the bowling alley, where Evelio sent someone for gloves (*id.*). Sometime later, the group left the bowling alley to commit the robbery (*id*. at 571). Rizo helped his brother break a glass door,

which was used to gain access to the apartment (DE913:2171). The apartment was not empty. One of the robbers hit an occupant in the face (*id*. at 2136, 2173). When the man's sister tried to call the police, another robber pulled the telephone cord and held a gun to her head, and ultimately ripped the phone from the wall (*id.* at 2136, 2147). The crew handcuffed both victims in the living room (DE904:492; DE913:2144, 2173).

Not long after, the crew's lookout alerted that the police were near (DE904:575). Rizo and his brother successfully eluded police (*id*. at 579), but not before police seized the white Pathfinder containing their identification (DE903:399-407; DE904:575). Rizo and his brother fled to a relative's house, where they recounted the night's events. Rizo admitted to hitting a man during the robbery, adding that he was worried about police linking him to the botched robbery through his license and registration in the Pathfinder (DE913:2211). A few days later, other members of the crew went by the Pepper Cove apartment because Rizo and his brother claimed that they had left a gun and jewelry behind; however, the crewmembers found nothing (*id*. at 2214).

### B. Puerto Rican Cocaine Theft

In July 1992, Rizo's father and brother hatched a plan to steal cocaine from Colombian drug traffickers (DE913:2214-16). A co-conspirator met with the drug traffickers and placed a 25-kilogram cocaine order, which was supposed to be

delivered to customers in Puerto Rico (*id*. at 2227-29). The cocaine was diverted by the Rizo crew and delivered to a different buyer, who paid $13,000 for the stolen cocaine (*id*. at 2231-34). In Miami, conspiracy members loaded a car with books wrapped up to look like cocaine bricks, which car was then "interdicted" by Rizo and others impersonating uniformed police officers (*id*. at 2235-38). After the ruse, the Rizo crew divided the spoils (*id*. at 2241-45). Sometime later, one of the conspirators learned that a woman involved in the ruse had been kidnapped by the Colombians because they were suspicious about whether the cocaine had been seized by authorities (*id*. at 2245-46).

### C. Kidnapping and Marijuana Theft of "Ricardo"

The Rizo crew planned to steal marijuana from someone named "Ricardo" (DE906:936-37). They arranged for a co-conspirator to buy cocaine from the target to find out where he stored the drugs (*id*. at 937-40). The group kidnapped Ricardo and took him to the Rizos' farm (*id*. at 942-44). During the kidnapping, Rizo's father drove a car displaying a blue police light, which ultimately was used to transport Ricardo to the farm; Rizo's brother rode with another conspirator in a separate car, while Rizo rode in a third car with three other conspirators (*id*. at 943-44).

The group told Ricardo that they were corrupt police officers, pressuring Ricardo into eventually admitting that he had 500 pounds of marijuana in his house

(DE906:944, 948). Rizo's brother took the man's keys and went to retrieve the marijuana while Senior and another conspirator guarded Ricardo (*id*. at 945). The next morning, the group took the marijuana to a safehouse and abandoned Ricardo near Okeechobee Boulevard (*id*. at 947).

**D. Kidnapping and Attempted Robbery of Edison Cano**

The Rizo crew planned to rob a cocaine dealer based in Hialeah, Florida (DE906:948-49, 956). They made several cocaine orders with the woman to locate her stash house (DE905:670; DE906:950-951). At some point, the group decided to kidnap Edison Cano, whom they believed was storing drugs for the woman and whom they had followed to the stash house (DE905:690-93; DE906:957-60).

The group followed Cano, caught him, and placed him in a conspirator's car (DE906:965-66; DE911:1780-88). While forcing Cano into the car, Rizo and another conspirator beat him (DE905:697; DE906:973; DE911:1783-88; DE913:2277). They had intended to take Cano to the Rizo farm (DE905:698-99), but instead drove to a warehouse area where one of the conspirators disposed of a gun after spotting police (DE905:707-09; DE913:2276). After leaving the warehouse area with Cano, the conspirator ran a red light and was arrested by a state trooper (DE905:709-10; DE906:966; DE909:1306-14, 1335-52; DE911:1794-99; DE911:1821; DE913:2277, 2286).

In the meantime, Rizo and others broke into Cano's house in search of drugs (DE906:967; DE913:2286-91). During the robbery, Cano's sister and brother-in-law approached the house (DE906:968-69; DE909:1384-86, 1403-10; DE913:2291-92). One of the armed robbers pulled the brother-in-law out of his car and claimed to work for the Drug Enforcement Administration (DE909:1388-90, 1410-15). The sister managed to escape and drove to Cano's workplace, where she learned he had been kidnapped. The group stole Cano's safe, which contained jewelry, handguns, passports, and more than $22,000 in cash (DE906:969-73; DE913:2291-94). The proceeds were used to pay for the arrested co-conspirator's bond and attorney (DE906:971; DE913:2294-95).

**E. Robbery of Mercy De La Torre**

The Rizo crew planned to rob cocaine traffickers "Milton" and "Quique" (DE914:2320-23). While tailing Quique's minivan, the group came to a house at 114th Avenue, which they believed might contain drugs (*id*. at 2323). In planning to break into the house, which was for sale at the time, one of the conspirators made an appointment with the real estate agent, and two other conspirators went to the house to see if they could find anything that would point to drugs (*id*. at 2322-24).

The group went back to the house later that day to commit the robbery. Rizo knocked the house door down and pushed into the home along with his fellow crewmembers (DE914:2329-30). Mercy De La Torre, Milton's sister, and her

family—which included her seventy-five-year-old father and her thirteen-year-old son—were inside the house (DE902:112-121, 125-140, 142-65). At least five men entered the house brandishing guns and wearing bulletproof vests and police badges (DE902:150; DE914:2328). The men, which included Rizo, zip-tied the family, pushed them down, and threw blankets over them (DE902:150-151). They also pistol-whipped De La Torre's husband and pointed the gun at the boy (*id*. at 150). When De La Torre had trouble breathing under the blanket, her son begged the men to let her go, crying "Please, my mother's dying" (*id*. at 151). After ransacking the house and finding no drugs, the crew stole approximately $8,000 from De La Torre's import/export business (*id*. at 156-59). Upon returning to the Rizos' house, the crew acknowledged they were mistaken and that the drugs were stored elsewhere (DE914:2329-30).

### F. Robbery of Milton's Cousin

Milton had previously sold drugs to a "santo" of the Rizo crew (DE906:974-75). The group ultimately kidnapped and robbed Milton's cousin of five kilograms of cocaine (*id*. at 975-79). They took the cousin to the Rizo farm, where Rizo and Evelio Junior beat the man until he finally admitted that he had five kilograms of cocaine and approximately $40,000 at his home (*id*. at 979). Rizo and others went to the man's house and retrieved the drugs and money (*id*. at 980).

Before letting the man go, the group forced him to hold the cocaine in his hands while they photographed him, so that he would not report the incident to the police and so that they group would have proof that he was a drug trafficker (DE906:981-82).

## 4. **Standard of Review**

Interpretation of a criminal statute is a legal question subject to *de novo* review. *United States v. Williams*, 790 F.3d 1240, 1244 (11th Cir. 2015).

## Summary of the Argument

The district court erred in finding that Sentencing Guidelines § 1B1.13(b)(6) is a valid exercise of the Sentencing Commission's authority and in relying on that provision to grant Rizo's motion for a sentence reduction.

The district court erroneously reasoned that the Sentencing Commission acted within its congressionally delegated authority in promulgating subsection (b)(6). As several other Circuits have concluded, the language of Section 3582(c)(1)(A)(i) precludes nonretroactive changes in law from qualifying as extraordinary and compelling reasons for a sentence reduction. *See, e.g.*, *United States v. McCall*, 56 F.4th 1048 (6th Cir. 2022) (en banc).

No reasonable interpretation of Section 3582(c)(1)(A)(i)'s reference to "extraordinary and compelling" reasons, particularly when considering the statute's structure and purpose, can encompass nonretroactive or intervening changes in law.

Every lawfully imposed sentence reflects the law at the time of sentencing, and any disparity caused by a change in sentencing law merely reflects the *ordinary* operation of nonretroactivity principles. Statutory context confirms this interpretation. And authorizing individual district courts to recognize intervening changes in the law as extraordinary and compelling circumstances will produce the very sort of unwarranted sentencing disparities that the Sentencing Reform Act of 1984 was designed to eliminate.

## Argument

### I. The Sentencing Commission Exceeded Its Congressionally Delegated Authority In Promulgating Sentencing Guidelines § 1B1.13(b)(6).

Section 3582(c)(1)(A) provides an "except[ion]" to the overarching principle of federal sentencing law that a "federal court generally 'may not modify a term of imprisonment once it has been imposed.'" *Dillon v. United States*, 560 U.S. 817, 819 (2010) (quoting 18 U.S.C. § 3582(c)). Congress plainly instructed that any reason sufficient to overcome that general principle must be "extraordinary and compelling." 18 U.S.C. § 3582(c)(1)(A)(i).

Congress directed the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for [a] sentence reduction, including the criteria to be applied and a list of specific examples."

28 U.S.C. § 994(t).[4] That delegation of authority, however, "is not unlimited." *Batterton v. Francis*, 432 U.S. 416, 428 (1977). Even when reached through an exercise of delegated authority, an agency's interpretation of a statute must be set aside if the agency's interpretation is not "reasonable." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 58 (2011) (quotations omitted); *see Batterton*, 432 U.S. at 428. An agency cannot adopt an impermissible reading of the statute—*i.e.*, a reading that exceeds the gap left by Congress. *See Mayo Found.*, 562 U.S. at 53-58; *Batterton*, 432 U.S. at 428.

The Sentencing Commission in particular "was not granted unbounded discretion," and, as the Supreme Court has explained, "[b]road as" the Commission's "discretion may be," it "must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 753, 757 (1997); *cf. Mistretta v. United States*, 488 U.S. 361, 379 (1989) (reasoning that the discretion vested in the Commission does not violate the nondelegation doctrine because the Sentencing Reform Act "sets

---

[4] In *Loper Bright Enterprises v. Raimondo*, No. 22-451, the Supreme Court overturned *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). Because *Chevron* concerns the deference owed to an agency when Congress has only implicitly delegated interpretive authority, *Chevron*, 467 U.S. at 844, the Court's decision in *Loper* does not affect the deference due when Congress has *expressly* identified a gap for an agency to fill. *See United States v. Mead Corp.*, 533 U.S. 218, 228-29 (2001) (distinguishing among express and implicit delegation); *see also Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 286 (2016) (Thomas, J., concurring) (explaining that an "express and clear conferral of authority" to an agency does not implicate *Chevron*).

forth more than merely an 'intelligible principle' or minimal standards" to guide that discretion). In the Sentencing Reform Act, itself, Congress directed the Commission to ensure that its guidelines and policy statements remain "consistent with all pertinent provisions of any Federal statute." 28 U.S.C. § 994(a). And Congress authorized the Commission only to "make *recommendations to Congress* concerning modification or enactment of statutes relating to sentencing." *Id.* § 995(a)(20) (emphasis added). Accordingly, the Commission's definition of "extraordinary" and "compelling" must comport with the statute's text, context, and purpose.

But no reasonable interpretation of Section 3582(c)(1)(A)'s text, particularly considering the statute's structure and purpose, can encompass nonretroactive or intervening changes in law.

**a. As a textual matter, an intervening change in the law is neither "extraordinary" nor "compelling."**

To justify a sentence reduction under Section 3582(c)(1)(A)(i), a proffered reason must be both "extraordinary" and "compelling." As a matter of plain language, an intervening change in the law is neither.

Congress's decision not to apply a statutory change in sentencing law retroactively, in particular, is neither extraordinary nor compelling. Consistent with the "'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time

Congress enacted the statute,'" *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018), the word "extraordinary" should be understood "to mean 'most unusual,' 'far from common,' and 'having little or no precedent,'" *McCall*, 56 F.4th at 1055 (quoting Webster's Third New International Dictionary of the English Language 807 (1971) (Webster's)). Far from being unusual, uncommon, or unprecedented, a defendant's lawfully imposed sentence simply reflects the law at the time he was sentenced. And any potential disparity between his sentence and the sentence he might receive today merely reflects the operation of ordinary nonretroactivity principles.

Rizo invoked Congress's decision not to extend the First Step Act's amendment to Section 924(c) to defendants like him as a change in law warranting a sentence reduction. In the First Step Act, Congress amended Section 924(c) to provide that a mandatory consecutive 25-year[5] sentence under Section 924(c)(1)(C) applies only after a prior conviction under Section 924(c) has become final. In Section 403(b) of the Act, however, Congress made the deliberate choice not to make that amendment applicable to defendants who had been sentenced before the Act's enactment, specifying that the change would apply only "if a sentence for the offense has not been imposed as of such date of enactment." § 403(b), 132 Stat. 5222. In so

[5] At the time of Rizo's sentencing, a subsequent Section 924(c) conviction carried a 20-year, rather than a 25-year consecutive penalty.

doing, Congress adhered to "the ordinary practice" in "federal sentencing" of "apply[ing] new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey v. United States*, 567 U.S. 260, 280 (2012); *cf.* 1 U.S.C. § 109 (general nonretroactivity provision).

Given Congress's deliberate choice not to make the First Step Act's change to Section 924(c) applicable to defendants who had already been sentenced, "there is nothing 'extraordinary' about" the fact that Rizo's sentence reflects the statutory penalty that existed at the time he was sentenced. *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir. 2021); *see Crandall*, 25 F.4th at 586 (Congress's prospective increase or decrease in statutory penalties is not "'extraordinary' as an empirical matter"). That sentence "was not only permissible but statutorily required at the time." *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, C.J., concurring). And when Congress enacted the First Step Act, it specifically declined to disturb Rizo's sentence for his second Section 924(c) conviction, even as it made other (previous) statutory changes applicable to defendants previously sentenced. In Section 404 of the same Act, for example, Congress expressly enacted a mechanism allowing defendants convicted under certain drug statutes (those for which penalties had been modified by certain provisions of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372), to seek retroactive application of those statutory changes in their cases. Section 404 authorizes a

sentencing court to "impose a reduced sentence as if [those provisions] of the Fair Sentencing Act" had been in effect at the time of the defendant's offense. § 404(b), 132 Stat. 5222. But Congress simultaneously declined to disturb Section 924(c) sentences that had already been imposed notwithstanding the different penalties that Section 403 would require courts to apply at future sentencings.

A nonretroactive intervening development in sentencing law likewise cannot constitute a "compelling" reason for a sentence reduction. When Congress enacted the Sentencing Reform Act of 1984, "[c]ompelling" meant (and still means) "forcing, impelling, driving." *McCall*, 56 F.4th at 1055 (quoting *Webster's* 463). Thus, for a reason to be "compelling" under Section 3582(c)(1)(A)(i), it must provide a "forcing, impelling, [or] driving" reason to disturb the finality of a federal sentence. *Id.* (quotations omitted); *see Crandall*, 25 F.4th at 586 (change in law is not "compelling" because "[t]he new Congress did not disapprove of the penalties established by the prior Congress"). Even beyond the First Step Act's explicit determination not to apply the amendment to Section 924(c) retroactively, ordinary principles of nonretroactivity already consider, and reject, the notion that changes in statutory law generally should be applied retrospectively. Congress enacts new sentencing statutes against a background principle, codified in 1 U.S.C. § 109, that a criminal statute does not change the penalties "incurred" under an older criminal statute "unless the repealing Act . . . so expressly provide[s]." The "strong

presumption against statutory retroactivity" "is 'deeply rooted in our jurisprudence' and 'embodies a legal doctrine older than our Republic.'" *United States v. Jenkins*, 50 F.4th 1185, 1198 (D.C. Cir. 2022) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). To treat a nonretroactive change in the law as a "compelling" reason to disturb a final sentence would thus undo the balance already struck by ordinary nonretroactivity principles. Nothing about a nonretroactive change in the law forces, impels, or drives such a nonsensical outcome.

Any disparity between Rizo's sentence and the sentence he would receive today is the product of deliberate congressional design—namely, Congress's decision not to make the First Step Act's change to Section 924(c) applicable to defendants who had already been sentenced. As the Supreme Court has recognized, such "disparities, reflecting a line-drawing effort, will exist whenever Congress enacts a new law changing sentences (unless Congress intends re-opening sentencing proceedings concluded prior to a new law's effective date)." *Dorsey*, 567 U.S. at 280. And treating Congress's express adherence to "ordinary practice" in federal sentencing, *id.*, "as simultaneously creating an extraordinary and compelling reason for early release" would contravene various canons of construction, *United States v. Andrews*, 12 F.4th 255, 261 (3d Cir. 2021).

Accordingly, a nonretroactive change in the law cannot serve as either an "extraordinary" or a "compelling" reason for a sentence reduction in isolation or as

contributing to a package of such "reasons." 18 U.S.C. § 3582(c)(1)(A)(i). Whether considered alone or in combination with other asserted factors, the possibility that a previously sentenced defendant might receive a lower sentence if he were sentenced today is a "legally impermissible" consideration for purposes of determining whether an extraordinary and compelling reason exists. *Jenkins*, 50 F.4th at 1202 (quotations omitted); *see Crandall*, 25 F.4th at 586 (explaining that a nonretroactive change to sentencing law is a "legally impermissible ground" for finding "extraordinary and compelling reasons," even when combined with other considerations).

**b. Statutory context confirms that "extraordinary and compelling" cannot include intervening changes in law.**

Section 3582(c)(1)(A)(i)'s context further establishes that the term "extraordinary and compelling" cannot encompass intervening changes in law.

In the Sentencing Reform Act, Congress instructed that the Commission "shall describe what should be considered extraordinary and compelling reasons for [a] sentence reduction," and that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Relying on that language, defenders of the Sentencing Commission's definition of "extraordinary and compelling" claim that Congress placed only one textual limit on the reasons that might warrant a sentence reduction.

That contention disregards the statute's text and misunderstands the purpose of Section 994(t)'s limitation. As a textual matter, Section 3582(c)(1)(A) itself expressly limits any reasons invoked to justify a sentence reduction to those that are both "extraordinary and compelling." Had Congress instead intended to impose no limitation beyond rehabilitation, it could have drafted the statute to permit a sentence reduction whenever the district court simply finds that any "reasons" or any "reasons identified by the Sentencing Commission" warrant a reduction. Congress did not write such a broad statute. *See McCall*, 56 F.4th at 1063.

This claim also misconceives the purpose of Congress's express carveout for rehabilitation. The Sentencing Reform Act was substantially premised on the view that "almost everyone involved in the criminal justice system now doubts that rehabilitation can be induced reliably in a prison setting." S. Rep. No. 98-225, at 38 (1983) (Senate Report). Thus, a defendant who *could* establish his rehabilitation would present circumstances that Congress considered unusual—and thus circumstances that may well fall within the ordinary meaning of "extraordinary and compelling." Through Section 994(t), however, Congress nevertheless excluded that reason and determined that rehabilitation would not, by itself, provide grounds for a sentence reduction, "consistent with" Congress's "rejection . . . of the rehabilitation theory as the basis for determining the length of a term of imprisonment." *Id.* at 179. Given this context, it also makes sense that Congress

prohibited rehabilitation from providing the basis for a sentence reduction only when considered "alone." 28 U.S.C. § 994(t). Once a defendant has identified a statutorily eligible "extraordinary and compelling" reason for a reduction, a court naturally should consider the combined force of all such reasons. But in all events, Section 994(t)'s carveout does not suggest that Congress intended to implicitly empower the Sentencing Commission to conclude that any reason, other than rehabilitation, falls within the narrow category of "extraordinary and compelling."

These arguments also fail to pay heed to § 994(a), which restricts the Sentencing Commission to issuing policy statements and Guidelines that are "consistent with all pertinent provisions of any Federal statute." 28 U.S.C. § 994(a). As this case shows, it is impossible to reconcile Section 403(b) of the First Step Act with the new policy statement's subsection (b)(6). The former excludes prisoners in Rizo's position—those with a pre-2018 second Section 924(c) sentence—from benefiting from the new, more forgiving penalty scheme. Yet the latter allows those same prisoners to move under Section 3582(c)(1)(A) for the exact same thing. If the district court's order stands, then Rizo effectively will get the benefits of First Step Act Section 403 despite Section 403(b) expressly limiting its reach to individuals whose "sentence for the offense has not been imposed as of [the December 2018] date of enactment." Pub. L. No. 115-391, § 403(b). Seen in this light, Section 1B1.13(b)(6)'s "unusually long" sentences rule flies in the face of

pertinent provisions of the very same federal statute (the First Step Act) that allowed defendants to begin moving for compassionate release. And when the Commission's policy statement conflicts with Congress, 28 U.S.C. § 994(a) teaches that the Commission must yield. There is no reason to believe that Congress barred the front gate of the prison against this cohort of violent and dangerous convicts only to leave the side door unlocked.

Other features of the statutory scheme further confirm that the phrase "extraordinary and compelling reasons" does not encompass changes in law. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction" is "a holistic endeavor," and a provision "is often clarified by the remainder of the statutory scheme.").

Most notably, in the paragraph that follows Section 3582(c)(1)(A), Congress expressly addressed the retroactive application of some changes in law. In Section 3582(c)(2), Congress authorized courts to modify a term of imprisonment where a defendant was sentenced "based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); *see* 28 U.S.C. § 994(u) (directing the Commission to determine when such modifications are appropriate). There would have been no reason for Congress, "skeptical of sentence modifications as a general rule," to have "provide[d] for the retroactive application of specific changes in sentencing law in § 3582(c)(2)" if Section

3582(c)(1)(A)(i) "already covered all legal developments, retroactive or not." *McCall*, 56 F.4th at 1056. That Congress did not similarly provide the Commission or district courts with express authority to revisit sentences in light of other changes in law suggests that Congress did not intend Section 3582(c)(1)(A) to reach such changes.

Reducing sentences based on intervening changes in the law also would undermine congressional design more generally because a motion brought pursuant to 28 U.S.C. § 2255 is the "remedial vehicle" Congress "specifically designed for federal prisoners' collateral attacks on their sentences." *Jones v. Hendrix*, 599 U.S. 465, 473 (2023); *see Thacker*, 4 F.4th at 574 (explaining that Section 2255 provides the "principal path" that Congress has "established for federal prisoners to challenge their sentences" after they have become final). Treating a nonretroactive change in the law as an "extraordinary and compelling" reason for a sentence reduction would allow defendants to "avoid the restrictions of the post-conviction relief statute by resorting to a request for compassionate release instead." *Crandall*, 25 F.4th at 586. It "would wholly frustrate explicit congressional intent to hold that [defendants] could evade" those restrictions "by the simple expedient of putting a different label on their pleadings." *Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973). Congress surely "knew of its specific statutory scheme authorizing post-conviction relief" both "when it [enacted Section 3582(c)(1)(A)] in 1984 and amended it in 2018," and had

"Congress intended the compassionate-release statute to act as an exception to this post-conviction framework, it would have made that intent specific." *McCall*, 56 F.4th at 1057-58 (quotations omitted).

**c. Permitting consideration of changes in law undermines the Sentencing Reform Act's primary purpose.**

Recognizing intervening changes in law as extraordinary or compelling reasons for a sentence reduction under Section 3582(c)(1)(A)(i) also would undermine a primary purpose of the Sentencing Reform Act, in which that provision was enacted.

Through the Act, Congress sought to eliminate the "'unjustifi[ed]' and 'shameful' consequences" of a sentencing regime that produced "great variation among sentences imposed by different judges upon similarly situated offenders" and "uncertainty as to the time [an] offender would spend in prison." *Mistretta*, 488 U.S. at 366 (quoting Senate Report at 38, 65); *see also Neal*, 516 U.S. at 290-91 ("The Commission was born of congressional disenchantment with the vagaries of federal sentencing and of the parole system"). The practices of federal courts and the Parole Commission left "each judge . . . to apply his own notions of the purposes of sentencing," resulting in an "astounding" and "inevitable disparity" in sentencing that was "not justified by differences among offenses or offenders" and was "unfair both to offenders and to the public." Senate Report at 38, 41, 45. "A primary goal" of the Act was "the elimination of unwarranted sentencing disparity." Senate

Report at 52. In "overhaul[ing] federal sentencing practices" by "abandon[ing] indeterminate sentencing and parole," Congress sought to "channel[ ] judges' discretion by establishing a framework to govern their consideration and imposition of sentence." *Tapia v. United States*, 564 U.S. 319, 325 (2011).

Consistent with Congress's goal of determinate sentencing, Section 3582(c)(1)(A) was enacted as a narrow "safety valve" for "unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances." Senate Report at 55, 121. Congress anticipated that such "justification[s] for reducing a term of imprisonment" would arise in a "relatively small number" of cases, and specifically identified severe or terminal illness as the archetypical "extraordinary and compelling circumstance[]" that would justify reducing a sentence. *Id*. at 55-56, 121.

Subsection (b)(6), however, purports to allow a district court to reduce a defendant's sentence whenever, in the judge's estimation, the defendant received "an unusually long sentence" that now represents a "gross disparity" from the sentence the court would likely impose today. U.S.S.G. § 1B1.13(b)(6). As one court has correctly observed, the provision is "unworkably vague," and the terms "'unusually long'" and "'gross disparity'" "lack any form of definition and invite arbitrary application." *United States v. Crandall*, No. 89-cr-21, 2024 WL 945328, at *9 (N.D. Iowa Mar. 5, 2024).

Indeed, as even the brief period since subsection (b)(6) became effective demonstrates, individual judges inevitably have divergent views concerning whether a lawfully imposed sentence is "unusually long" and whether particular disparities are sufficiently "gross" to warrant relief. In observing that "there is considerable uncertainty about when a sentence should be considered 'unusually long,'" one court has suggested that *any* sentence "significantly longer" than the average length of all federal sentences (or 51 months, in 2022) is unusually long. *United States v. Howard*, No. 13-cr-629, 2024 WL 112010, at *15-16 (D. Md. Jan. 10, 2024). Another reasoned that a life sentence "[u]ndoubtedly" is "unusually long," *United States v. Capps*, No. 11-cr-108, 2024 WL 880554, at *4 (E.D. Mo. Jan. 31, 2024), while a third found that a life sentence is not invariably unusually long, *United States v. Wilson*, No. 13-cr-20369, 2024 WL 1342618, at *3 (E.D. Mich. Mar. 29, 2024).

"In the absence of guidance" concerning "what might constitute a 'gross disparity,'" district courts "around the country have come to markedly different conclusions." *United States v. Douglas*, No. 11-cr-324, 2024 WL 2513646, at *2 (D. Minn. May 24, 2024). One court, for example, found that a 21-month disparity constituted a gross disparity for a defendant convicted of Hobbs Act robbery and under 18 U.S.C. § 924(c). *Howard*, 2024 WL 112010, at *17. Yet, a different court in the same circuit considering a defendant convicted of the same two offenses found that a 24-month disparity would *not* be grossly disparate. *United States v. Miller*,

No. 09-cr-1, 2024 WL 476879, at *5 (E.D.N.C. Feb. 7, 2024). One court has found a five-and-a-half-year disparity grossly disparate, *see United States v. Adley*, No. 03-cr-20678, 2024 WL 1961484, at *5 (S.D. Fla. May 3, 2024), while others reject the claim that a five-year disparity is sufficient, *see Douglas*, 2024 WL 2513646, at *2; *United States v. Hill*, No. 11-cr-536, 2024 WL 2089011, at *3 (N.D. Ohio May 9, 2024).

Subsection (b)(6)'s broad grant of authority is incompatible with the Sentencing Reform Act's overarching purpose and Congress's specific intent with respect to Section 3582(c)(1)(A). It effectively reproduces the indeterminate system the Act sought to eliminate, in which judges applied their own varied "notions of the purposes of sentencing." Senate Report at 38. It is doubtful the Sentencing Reform Act "contained the[ ] seeds of its own destruction," *Jenkins*, 50 F.4th at 1202, and there is no basis to think that, notwithstanding the Act's express purpose of eliminating parole in favor of determinative sentencing, Congress nevertheless created such "a freewheeling opportunity for resentencing based on prospective changes in sentencing policy or philosophy," *Crandall*, 25 F.4th at 586.

The Sentencing Commission's explanation for the amendment cites a single sentence from the Senate Report to support its conclusion that Section 3582(c)(1)(A)(i) allows courts to reduce "unusually long sentences." *See* 88 Fed. Reg. at 28,258. In the relevant passage, the Senate Judiciary Committee expressed

its belief that the "unusual cases in which an eventual reduction in the length of a term of imprisonment" would be "justified by changed circumstances" might include "cases of severe illness" or "cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence." Senate Report at 55.

The Commission takes that single sentence—which is ambiguous at best—out of context and elevates it above the Act's plain text and overarching purpose. In context, the passage suggests only that Congress anticipated that the sort of "changed circumstances" that might warrant a sentence reduction would most often emerge during the duration of an "unusually long" period of incarceration—during which a prisoner might become elderly or infirm, for example. Senate Report at 55. Indeed, the passage makes clear that to justify even the reduction of an unusually long sentence Congress understood Section 3582(c)(1)(A) to require the identification of particular "extraordinary and compelling circumstances." *Id.* The passage does not suggest that Section 3582(c)(1)(A) provides authority to reduce any sentence a court subsequently comes to view, in hindsight, as "unusually long."

The Commission also invokes the First Step Act of 2018's stated intent to increase the use of sentence reduction motions. *See* 88 Fed. Reg. at 28,256; § 603(b), 132 Stat. 5239. But nothing about the First Step Act's procedural

amendment to Section 3582(c)(1)(A) or Congress's expectation that the amendment would lead to greater use of that provision "suggests Congress intended to change th[e] *substantive* status quo with a process-oriented amendment." *McCall*, 56 F.4th at 1060 (emphasis added). Congress's effort to allow defendants to file sentence-reduction motions directly sought to remedy perceived deficiencies in the BOP's preexisting procedures, which prevented the BOP from bringing Section 3582(c)(1)(A) motions on behalf of some defendants who satisfied longstanding criteria for relief.[6]

Congress, however, did not amend the statutory requirement that reasons for a sentence reduction must be extraordinary and compelling. Tellingly, the amendment explicitly conditions a defendant's filing on a requirement that he first "exhaust[ ]" with BOP a request that BOP "bring a motion on the defendant's behalf." 18 U.S.C. § 3582(c)(1)(A). Congress could not have expected BOP to evaluate whether an intervening change in law warrants a defendant's early release from custody; indeed, BOP typically plays no role in "determining the lawfulness of

---

[6] *See* Sentencing Guidelines App. C Supp., Amend. 799 (noting evidence showing "inefficiencies that exist within the Bureau of Prisons' administrative review of compassionate release applications, which can delay or deny release, even in cases where the applicant appears to meet the criteria for eligibility"); U.S. Dep't of Justice, Office of the Inspector Gen., *The Federal Bureau of Prisons' Compassionate Release Program* 53 (2013) (finding that the "inconsistent and ad hoc implementation" of BOP's "compassionate release program" has "likely resulted in potentially eligible inmates not being considered for release").

individual sentences," "calculating guideline ranges," or assessing the possible disparity produced by a defendant's sentence. *See Jenkins*, 50 F.4th at 1205-06. In short, nothing about the First Step Act's procedural amendment "indicates any intention on Congress's part" to "fundamentally change the nature of compassionate release." 4/5/23 Tr. 64-66 (Vice Chair Murray, delivering joint statement); *cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes.").

## II. Other Circuits Have Concluded That "Extraordinary and Compelling" Does Not Encompass Nonretroactive Changes in the Law.

The First Step Act authorized defendants and the BOP to file motions for a sentence reduction. *See* Pub. L. No. 115-391, Tit. VI, § 603(b), 132 Stat. 5194, 5239. Shortly after the First Step Act's enactment, the Sentencing Commission lost a quorum of voting members and therefore did not immediately amend the policy statement to account for the Act's procedural change. Before the policy amendment, other circuits held that the then-existing policy statement's definition of "extraordinary and compelling" reasons for a sentence reduction was not applicable to defendant-filed motions. *See United States v. Ruvalcaba*, 26 F.4th 14, 21 (1st Cir. 2022) (collecting cases). *But see United States v. Bryant*, 996 F.3d 1243, 1262 (11th Cir.), *cert. denied*, 142 S. Ct. 583 (2021).

Without a binding policy statement, those circuits were obliged to construe the plain meaning of the phrase "extraordinary and compelling" reasons as used in

Section 3582(c)(1)(A)(i). A majority of circuits concluded that a change in the law, whether considered alone or in combination with other factors, cannot constitute an "extraordinary and compelling" reason to authorize a sentence reduction. *See United States v. Andrews*, 12 F.4th 255, 261 (3d Cir.), *cert. denied*, 142 S. Ct. 1446 (2021); *United States v. McCall*, 56 F.4th 1048, 1050 (6th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 2506 (2023); *United States v. Thacker*, 4 F.4th 569, 571 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1363 (2022); *United States v. Crandall*, 25 F.4th 582, 585-586 (8th Cir.), *cert. denied*, 142 S. Ct. 2781 (2022); *United States v. Jenkins*, 50 F.4th 1185, 1198-1200 (D.C. Cir. 2022); *see also United States v. McMaryion*, No. 21-50450, 2023 WL 4118015, at *2 (5th Cir. June 22, 2023) (per curiam) (unpublished). Four circuits, however, took the view that a change in law can form part of an individualized assessment of whether to grant a sentence reduction, but only in combination with other case-specific factors. *Ruvalcaba*, 26 F.4th at 28 (1st Cir.); *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020); *United States v. Chen*, 48 F.4th 1092, 1097-1098 (9th Cir. 2022); *United States v. McGee*, 992 F.3d 1035, 1047-1048 (10th Cir. 2021).

The majority has the right of it, for several reasons. First, the text. As the Sixth Circuit explained in *McCall*, "an 'extraordinary and compelling reason' is one that is unusual, rare, and forceful." 56 F.4th at 1055. But in the context of federal sentencing law, which is governed by principles of finality and nonretroactivity, "the

ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Id*. (quoting *Dorsey v. United States*, 567 U.S. 260 (2012). Accordingly, "the text of the compassionate-release statute gives way to a basic inference: What is 'ordinary' and routine cannot also be extraordinary and compelling." *Id.* Moreover, the length of a sentence does little to transform it into an extraordinary and compelling reason for relief because it "represents the exact penalty that Congress prescribed and that a district court imposed for a particular violation." *McCall*, 56 F.4th at 1056.

Nor does the structure of Section 3582(c) compel a different reading. "Viewed as a whole, that body of law makes one thing clear: When Congress wants a change in sentence law to have retroactive effect, it explicitly says so." *Id.* The Sentencing Reform Act of 1984 listed two exceptions to its general prohibition on sentence modifications: the compassionate-release provision, 18 U.S.C. §3582(c)(1), and a provision allowing for retroactive application of certain Sentencing Guideline amendments, *id*. § 3582(c)(2). There is no reason for the same Congress—especially one "skeptical of sentence modifications as a general rule"—to provide for the retroactive application of specific guidelines provisions when it had already covered all legal developments, retroactive or not, under Section 3582(c)(1)(A). *See McCall*, 56 F.4th at 1056.

The same argument applies to the First Step Act. Particularly relevant here, Congress chose *not* to apply its revised Section 924(c) stacking rule to defendants sentenced before the passage of the Act. *See* Pub. L. No. 115-391, § 403, 132 Stat. 5220-22. The Commission's interpretation of "extraordinary and compelling," then, becomes an untenable end-run around Congress's mandate while purporting to implement congressional directives. In other words, though barred from relief under Section 2255, Rizo could sidestep these restrictions by "resorting to a request for compassionate release instead." *Crandall*, 25 F.4th at 586. In Congress intended to create an exception that swallowed the rule, "it would have made that intent specific." *McCall*, 56 F.4th at 1058; *see also Banister v. Davis*, 590 U.S. 504, 514 (2020) (noting that, when Congress intends to effect a change in the law, "it usually provides a clear statement of that objective"). That no such intent appears in the phrase "extraordinary and compelling reasons" is a powerful indication that Congress did not wish for such a result. *See Bryant*, 996 F.3d at 1259.

"What text and structure show, history confirms." *McCall*, 56 F.4th at 1059. Namely, compassionate release has never been used as a vehicle for rehashing nonretroactive changes in sentencing law. Well before the Commission issued its policy statement, the Bureau of Prisons—at the time, the only entity empowered to submit compassionate release petitions—moved for compassionate release in cases where the inmate's health compelled relief. See Fed. Bureau of Prisons, U.S. Dep't

of Justice, Change Notice No. 5050.46, *Program Statement Concerning Compassionate Release; Procedures for Implementation of 18 U.S.C. § 3582(c)(1)(A) & 4205(g)*, 1(a)(1)(d); 4(c) (1998). The Commission's guidance expanded on this theme—adding, for example, old age, family caretaking emergencies, and a "catch-all provision" for other circumstances approved by the Bureau of Prisons—but never included nonretroactive legal developments. *See* U.S.S.G. § 1B1.13 cmt. n1(B)-(D).

Congress no doubt understood the history of Section 3582(c)(1) when it amended the compassionate release statute. And yet, it left the substance of the statute—the operative eligibility language of "extraordinary and compelling reasons"—intact. Under the prior-construction canon, a phrase will retain "the meaning it had under the previous version of the statute," unless substantially altered. *Andrews*, 12 F.4th at 260 (citing Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)). This Court should adopt the well-reasoned opinions from those circuits that considered this question before the most recent Guidelines amendment and rejected any efforts to extend eligibility to nonretroactive changes in law. Because "extraordinary and compelling," has never extended to nonretroactive changes in sentencing law, and nothing in the First Step Act so much as hints at congressional intent to alter this framework, the Sentencing Commission exceeded its authority in promulgating

subsection (b)(6) and the district court should not have relied on it to reduce Rizo's sentence.

## Conclusion

For the foregoing reasons, this Court should reverse the district court's order reducing Rizo's sentence.

Respectfully submitted,

Markenzy Lapointe
United States Attorney

By: *s/ Yeney Hernandez*
Yeney Hernandez
Assistant United States Attorney
99 N.E. 4th Street, #500
Miami, FL 33132
(305) 961-9277
Yeney.Hernandez@usdoj.gov

Daniel Matzkin
Chief, Appellate Division

Of Counsel

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,982 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-based typeface using Microsoft Word 2016, 14-point Times New Roman.

**Certificate of Service**

I hereby certify that four copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 10th day of July 2024, and that, on the same day, the foregoing brief was filed using CM/ECF and served United States Mail on Abel Rizo, Reg. No. 75630-004, FCI Fort Dix - Inmate Legal, P.O. Box 2000, Joint Base Mdl, NJ 08640.

s/ *Yeney Hernandez*
Yeney Hernandez
Assistant United States Attorney

***cbe***